# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jonathan Hites, Kaela Zingaro, : 
Samuel Teolis on Behalf of : 
Minor Domenic Teolis, Individually : 
and on behalf of those similarly : 
situated : No. 8 C.D. 2017
 : Argued: September 11, 2017
v. : 
 : 
Pennsylvania Interscholastic : 
Athletic Association, Inc., : 
               Appellant : 

BEFORE:   HONORABLE ROBERT SIMPSON, Judge
              HONORABLE ANNE E. COVEY, Judge
              HONORABLE MICHAEL H. WOJCIK, Judge

OPINION NOT REPORTED

**MEMORANDUM OPINION**
**BY JUDGE SIMPSON**         **FILED: October 10, 2017**

        In this interlocutory appeal by permission, the Pennsylvania Interscholastic Athletic Association, Inc. (PIAA) asks whether the Court of Common Pleas of Lawrence County[1] (trial court) erred in overruling, in part, its preliminary objections to the negligence suit filed by Jonathan Hites, Kaela Zingaro, and Samuel Teolis, on behalf of minor Domenic Teolis, individually and on behalf of those similarly situated (collectively, Plaintiffs). Through their complaint, Plaintiffs seek to recover damages arising from concussion-related injuries inflicted during participation in PIAA-regulated sports.

---

[1] The Honorable Eugene E. Fike, II, S.J., presided.

The four issues before this Court at this time relate solely to negligence claims: (1) whether the claims are non-justiciable due to the effect of the Safety in Youth Sports Act[2] (SYSA); (2) whether Plaintiffs are barred from recovery as a matter of law, because of the "inherent risk/no duty" rule; (3) whether Plaintiffs are unable to establish the requisite "duty" as an element of their negligence cause of action because the "duty" may not be imposed on the PIAA as a matter of public policy; and, (4) whether Plaintiffs failed to aver facts to show the requisite causation. After review at this earliest stage of litigation, we affirm.

## I. Factual and Procedural Background
## A. Plaintiffs' Original Complaint

The trial court set forth the following background to this matter based on the facts averred in Plaintiffs' original complaint (Complaint). "This is an action to recover damages on behalf of the named Plaintiffs, Jonathan Hites [(Hites)], Kaela Zingaro [(Zingaro)], and Domenic Teolis [(Teolis)], as well as on behalf of the members of the below-defined [c]lass, arising from concussion-related injuries inflicted during participation in PIAA regulated sports." Tr. Ct., Slip Op., 10/11/16, at 1 (quoting Compl. at ¶15). Among other things, Plaintiffs aver the PIAA voluntarily assumed the duty to protect student athletes in Pennsylvania, but its "concussion policies" are "insufficient and ineffective[,]" and the PIAA failed to: "adequately implement and interpret accurate pre-season and regular season baseline testing for detecting and managing concussions," id. at 2 (quoting Compl. at ¶6(a)); "track and report concussions (and require such reporting from member schools)," id. (quoting Compl. at ¶6(b)); "require qualified medical personnel at all PIAA sporting practices and events with specific expertise in concussion diagnosis,

---

[2] Act of November 9, 2011, P.L. 411, 24 P.S. §§5321-5323.

treatment, and management," id. (quoting Compl. at ¶6(c)); "mandate the removal of athletes who have appeared to suffer concussions in practice as well as in games," id. (quoting Compl. at ¶6)(d)); "take measures for educating teachers and other school personnel on how to implement medical recommendations of concussed athletes and make appropriate accommodations," id. (quoting Compl. at ¶6(e)); and, "provide resources to student athletes in seeking professional medical attention at the time of an injury, during the course of treatment for such injury, and for necessary medical monitoring post-injury." Id. (quoting Compl. at ¶6(f)).

The Complaint alleges the following facts specific to the injuries suffered by each of the named Plaintiffs.

**1. Plaintiff Jonathan Hites**

In August 2011, Hites was a football player for Neshannock High School. He was instructed to participate in football summer camp. Hites "experienced a brutal blow" during a practice session. Tr. Ct., Slip Op., at 7 (quoting Compl. at ¶12). Although Hites was "staggering and dizzy, [he] was required to continue participation in practice … until he vomited on the field …" when he was "allowed to sit out." Id. (quoting Compl. at ¶13). Hites "reported ongoing dizziness and nausea, but … despite the symptoms of a concussion, [Hites] was not permitted to leave the practice field." Id. Plaintiffs aver Hites "remembers the morning practice concluding and everyone leaving for lunch[,]" but he "has no recollection of any true events …" until dinner, when he was "unable to eat"; after dinner, Hites sat on the bench and watched a scrimmage "until he lost consciousness," and "[at] that time his parents were finally contacted." Id. (quoting Compl. at ¶14).

3

Plaintiffs further allege: Hites' father picked him up and took him to an emergency room; approximately 12 hours passed from the time the injury occurred; and, Hites was referred to a concussion clinic in Pittsburgh. Plaintiffs also aver: Hites' concussions were "severe"; he could not attend school for approximately four months; he struggled in school and socially; he began to experience difficulties, including "secondarily-acquired attention [deficit] disorder symptoms and lack of impulse control"; he began treating with a psychiatrist; and, he was diagnosed with "early-onset glaucoma causally connected to the traumatic blow to the head[.]" Tr. Ct., Slip Op., at 7-8 (quoting Compl. at ¶16).

In addition, Plaintiffs aver Hites received a full medical release in July 2012, and he was permitted to return to playing football. In the Fall of 2012, he was administered the "ImPACT baseline test," but the test "was conducted without oversight by a trained test administrator," and "[n]o prior baseline testing existed that allowed for comparing Hites "pre-concussion" with Hites "post-concussion." Id. at 8 (quoting Compl. at ¶17). Plaintiffs allege Hites continued to experience fatigue, headaches, confusion and disorientation, but he continued to play football "when he was not in a safe condition to do so[.]" Id. (quoting Compl. at ¶18). In 2013, while playing football, Hites suffered a serious back injury, and he is now unable to participate. Id.

Plaintiffs further aver Hites and his family paid medical expenses, which are expected to continue into the future to address the "transitioning symptoms of attention [deficit] disorder, impulsivity, glaucoma, headaches, and ongoing medical monitoring," but neither Hites nor his family was informed of the

4

availability of any resources in the form of PIAA-provided medical or financial aid for personal injury or otherwise.  Id. (quoting Compl. at ¶15).

## 2. Plaintiff Kaela Zingaro

As to Plaintiff Zingaro, Plaintiffs allege: Zingaro was injured in June 2014 in the final softball game of the season, sustaining a concussion from striking her head on the ground while attempting to make a diving catch; Zingaro became dizzy and nauseous; and, by midnight, her nausea "reached a point" causing her mother to take her to the hospital by ambulance.  Id. at 9 (quoting Compl. at ¶¶20, 23).  Plaintiffs allege a CT scan showed no injury to the brain, but Zingaro was diagnosed with whiplash and a concussion and referred to a concussion clinic in which she participated for eight weeks, also undergoing orthopedic examinations and physical therapy at the direction of her treating physicians.

Plaintiffs further aver: Zingaro's headaches and dizziness remained for weeks; after a month, Zingaro began to feel better; and, two months after the injury, a medical professional cleared her to return to physical activity.  Plaintiffs allege the trainer who was at the game was not qualified to make a proper concussion determination, and, although Zingaro was removed from the game, "her coaches and trainer dismissed the possibility that she had a concussion," and her volleyball coach "pressed for her to appear the following day for practice."  Id. (quoting Compl. at ¶22).

Plaintiffs allege no "legitimate baseline testing" was performed on Zingaro, and, after the injury, the trainer "attempted to have [Zingaro] complete baseline testing every day, and appeared unaware of how to properly implement a valid concussion protocol."  Id.  Plaintiffs further aver, "although unable to play,

5

[Zingaro] was required to report to volleyball practice throughout the summer months while she underwent treatment." Id. (quoting Compl. at ¶24). Zingaro "struggled in returning to sport activities, and often struggled with concentration and headaches[.]" Id. at 9-10 (quoting Compl. at ¶24). Plaintiffs allege Zingaro's family incurred expenses for her treatment, and they will incur expenses in the future "as the result of the initial blow, secondary head trauma, return to practice, and delay in the receipt of treatment …" which include "addressing the transitioning symptoms of deterioration of eyesight, headaches, and ongoing medical monitoring." Id. at 10 (quoting Compl. at ¶25). Plaintiffs aver neither Zingaro nor her family was informed of the availability of any resources in the form of PIAA-provided medical or financial aid for personal injury or otherwise.

### 3. Plaintiff Domenic Teolis

As to Plaintiff Teolis, Plaintiffs allege: in October 2012, while he was a high school freshman, Teolis suffered "multiple severe hits" during a practice; after practice, he complained of headaches and nausea, but was placed in a game the following day; and, he suffered "additional head trauma …." Id. (quoting Compl. at ¶¶26-28). Plaintiffs aver Teolis reported his concussive symptoms to his trainer and coaches, but no medical treatment was provided during the game, and his parents took him to the hospital that evening where he was diagnosed with a concussion and referred to a concussion clinic. Id.

Plaintiffs allege Teolis was withdrawn from school for nine weeks as a result of his injury. In January 2013, he returned to school for half-day in-sessions, but he continued to experience "typical concussion difficulties," including headaches, dizziness, light sensitivity, and nausea. Id. at 11 (quoting Compl. at ¶29).

6

Plaintiffs further aver that treating physicians released Teolis in April 2015, but he continues to experience concussion symptoms, including periodic headaches and light and noise sensitivity.  Id.  Plaintiffs allege Teolis and his family incurred expenses in obtaining treatment, and it is expected that they will continue to "incur medical expenses as a result of the initial blow and his return to competitive play his injury notwithstanding."  Id.  Plaintiffs claim neither Teolis nor his family was informed of the availability of any financial resources in the form of PIAA-provided medical or financial aid for personal injury or otherwise.

### 4. Other Averments Relating to Plaintiffs' Negligence Claims

Plaintiffs further allege the PIAA is a statewide athletic association, whose membership consists of 1420 schools.  Further, in accordance with Articles VI and VIII of its Constitution: "[the] PIAA admits it possesses, 'control over all interscholastic athletic relations and athletic contests in which a member school of this association participates.'"  Id. (quoting Compl. at ¶51).  As stated in Article II of its Constitution, the PIAA's purpose is to "formulate and maintain policies that will safeguard the educational values of interscholastic athletics and cultivate high ideals of good sportsmanship."  Id. (quoting Compl. at ¶52).  Plaintiffs also aver "[the] PIAA openly acknowledges that participation in interscholastic athletic competition can be, and often is expected to be, demanding and stressful.  Although [the] PIAA considers injuries to be an inherent risk of participation, it further acknowledges its role and responsibility to successfully mitigate the risk of such injuries and illnesses through proper coaching, training, and supervision."  Compl. at ¶53.  And, in accordance with Article VII of its Constitution, the PIAA has the authority and power to fix and enforce penalties for violations of its Constitution, By-Laws, Policies and Procedures, its Rules and Regulations, "and such other by-

7

laws, policies, procedures, rules and regulations as it may, from time to time, adopt." Tr. Ct., Slip Op., at 3 (quoting Compl. at ¶55).

The Complaint cites Article V of the PIAA's By-Laws, and it avers the PIAA "believes that all students should have a thorough, pre-participation physical evaluation by an Authorized Medical Examiner, to ensure that there are present no obvious illnesses and/or injuries, which would place the student or others of enhanced risk or injury through the student's participation in interscholastic athletics … and that a review and re-certification of some students is necessary prior to their participation in their next sport season." Id. (quoting Compl. at ¶54). Further, the PIAA prescribes a form for a Comprehensive Initial Pre-Participation Physical Evaluation (CIPPE), and at the beginning of every school year, each athlete must submit a completed CIPPE, in which, there is a one-page document titled, "Understanding of Risk of Concussion and Traumatic Brain Injury (also known as [the] 'Concussion Information Sheet')," which defines a concussion, its signs and symptoms, and action to be taken when there is reason to believe someone suffered a concussion. Id. (quoting Compl. at ¶57).

Plaintiffs aver the PIAA assumed jurisdiction over the following boys and girls sports: baseball; basketball; bowling; competitive spirit (i.e., cheerleading, mascots); cross country; field hockey; football; golf; gymnastics; lacrosse; rifle; soccer; swimming and diving; softball, fast Pitch; tennis; track & field (both indoor and outdoor); volleyball; water polo; and, wrestling. They allege the PIAA member schools sponsoring any of these sports are subject to the provisions of the PIAA's Constitution, By-Laws, Policies and Procedures, and Rules and Regulations. "[The]

PIAA, therefore, holds the authority and duty to protect the student athletes over which the sponsoring extends." Compl. at ¶56.

Plaintiffs further allege the PIAA's responsibilities extend to providing resources to assist the student athlete, that the PIAA affirmatively represents "that [it] provides medical financial resources for student-athletes …." and that "[a]ccording to [the] PIAA, such resources are available for students during practice for, competition in or supervised group travel directly to and from, interscholastic athletic events[.]" Tr. Ct., Slip Op. at 3 (quoting Compl. at ¶58). Additionally, member schools' dues are used to fund these "medical financial resources" that extend "up to $5 million dollars per incident for each … student who participates in an interscholastic program at a PIAA member school[,]" but the PIAA "does not provide additional information to the parents and students regarding these resources such that Plaintiffs … can avail themselves of this financial support in a timely manner, if at all." Id. at 4 (quoting Compl. at ¶59).

Plaintiffs also aver the "PIAA's failure to require and enforce proper baseline testing and interpretation, failure to fully educate athletic departments and trainers regarding concussion diagnosis, protocols, or provide ongoing education with parents and student athletes, and failure to prioritize a safety culture educating student athletes on the importance of warning signs and the severity of concussion conditions has harmed and continues to harm, student athletes in Pennsylvania." Id. (quoting Compl. at ¶60).

9

In addition, Plaintiffs allege: "Despite possessing significant knowledge of the danger of concussion, it was not until recently that [the] PIAA substantively modified its policies and procedures, and only then in the wake of legislative change by the Commonwealth of Pennsylvania. PIAA waited until nearly nine years after the first international consensus statement on concussions (and still do not meet the consensus standards) to substantively act. Such acts and omissions … give rise to the [three counts stated in the Complaint]." Compl. at ¶71.

Count I of the Complaint asserts a cause of action for negligence, which includes an averment that the PIAA's violation of the standard of care exceeds ordinary negligence and constitutes gross negligence. Count II asserts a cause of action for establishment of a medical monitoring trust fund. Count III asserts claims for equitable relief. In addition to a demand for monetary damages and equitable relief, Plaintiffs also request: certification as a class action suit; appointment of Plaintiffs as class representatives and Plaintiffs' counsel as class counsel as well as a request for attorney fees and costs to class counsel. Only count I of the Complaint, which sets forth Plaintiffs' negligence claims, is at issue here.

Count I states:

72. Because the PIAA has assumed the role as the guardian of player safety, student athletes and their families, including [Plaintiffs], have looked to PIAA for guidance and protection on player-safety issues. Student-athletes are often as young as 12 when they begin their sports participation in schools and are not on equal footing with [the] PIAA when it comes to understanding the importance of brain injury prevention and treatment, nor do they possess the resources to ensure safe play, diagnosis of concussion, proper return to activity, or medical oversight.

10

73. [The] PIAA was in a superior position to know of student-athletes' concussion-injury rates and the long-term medical consequences. [The] PIAA and its members breached the duty to provide a 'safe environment' and by failing to provide long-term and/or complete medical or financial aid for student-athletes who suffered concussion(s) while playing PIAA sports.

74. [The] PIAA's conduct is particularly egregious in light of the fact that its policies and procedures - or lack thereof - leave student-athletes like Plaintiffs … inadequately protected from sustaining, monitoring, and recovering from brain injuries at a particularly early and vulnerable point in their lives. Unlike professional athletes, who at least have resources to pay for medical care necessitated by head injuries caused during their professional careers, youth athletes range in age from 12-18. For such PIAA student-athletes, including Plaintiffs … these injuries may have long-term, debilitating effects, ranging from an inability to finish their education, to loss of memory, physical impairments in hearing and sight, depression, and early-onset dementia.

75. [The] PIAA was aware of the health risks associated with blows producing sub-concussive and concussive results, and was further aware that members of the PIAA athlete population were at significant risk of developing brain damage and cognitive decline as a result. Despite its knowledge and controlling role in governing member schools, coaches, trainers, and student player conduct, the PIAA failed to timely and adequately impose safety regulations and post-concussion protocols governing this health and safety problem.

76. [The] PIAA has a legal duty to exercise reasonable care toward the student athletes under its authority. Such duty encompasses the duty to exercise reasonable care for the health and safety of student athletes. [The] PIAA has breached such duties by failing to:

> (a) require and enforce proper screening, baseline testing and interpretation prior to a student-athlete's

11

participation in a sport and proper use of the baseline testing for both immediate diagnosis of concussion and return-to-play decisions;

(b) fully educate athletic departments and trainers regarding concussion diagnosis, protocols, or provide ongoing education with parents and student athletes;

(c) provide adequate medical personnel trained in concussions or adequate medical equipment for use by team physicians and/or athletic trainers for concussion diagnosis;

(d) provide proper planning for athletic injuries and emergency situations that may arise in the context of practices and athletic events;

(e) prioritize a safety culture educating student athletes on the importance of warning signs and the severity of concussion conditions;

(f) provide consistent and ongoing warning of long-term risks or provide adequate post-concussion care and monitoring;

(g) provide a safe playing environment;

(h) create, implement and enforce immediate diagnosis protocols through the use of trained medical personnel, immediate access to baseline testing, and comprehensive 'sideline' testing for head trauma (direct or indirect) for continuation of practice or play;

(i) create, implement and enforce proper return-to-activity (academic and athletic) protocols after a concussion diagnosis through medically-supported stepwise concussion protocols implemented by medical professionals trained in concussion;

(j) provide adequate medical financial resources or otherwise inform and educate student athletes and their parents regarding financial resources; and,

(k) provide resources and recommendations for and follow-up medical care and assessments.

[77.] [The] PIAA has a legal duty to exercise reasonable care in the creation and ultimate enforcement of its policies and procedures by its member schools. The duty to act in conformity with the standard of care imposed on a reasonable sport authority with jurisdiction over youth sports encompasses the obligations outlined above in the provision of trained medical professionals at practice and sporting events, trained baseline test administrators, adherence to post-concussion protocols, and provision of resources after injury. [The] PIAA's failure to act as a reasonable and prudent youth sports authority has resulted in the harm outlined above to [Plaintiffs] …

[78.] [The] PIAA's violation of the standard of care is greater than ordinary negligence – [the] PIAA has committed gross negligence in the manner in which it has failed in its duties to the youth of Pennsylvania. Parents and student athletes rely upon [the] PIAA in the creation, implementation, and enforcement of safety policies. [The] PIAA has possessed superior knowledge regarding prevention, diagnosis, and treatment of concussion in student athletes, but has recklessly promoted the successes of competitive sport over the risks and dangers of concussion. Furthermore, [the] PIAA's conscious lack of enforcement of proper protocols misleads parents and student athletes into a false sense of safety, and [the] PIAA's decision to remain mute on issues of post-concussion resources operates to increase the harm.

Compl. at ¶¶72-78.

13

Although count I does not contain a paragraph describing the relief requested, the trial court explained, if successful on their negligence cause of action, the Complaint's prayer for relief requests an award of monetary damages.

## B. The PIAA's Preliminary Objections

In response to the Complaint, the PIAA filed preliminary objections. Specifically, the PIAA objected to the legal sufficiency of the Complaint, asserting Plaintiffs' averments were insufficient to state a claim for which relief may be granted because, among other things, the Complaint: (a) fails to adequately allege either a statutory or non-statutory duty owed to Plaintiffs; (b) fails to adequately allege the existence of proximate cause; (c) presents a non-justiciable issue that is for the legislature rather than the courts; (d) seeks court intervention that would contravene Pennsylvania's strong policy against interference in PIAA decisions; and, (e) avers facts that make clear that Plaintiffs assumed the risk of potential injury.

## C. Trial Court's Opinion on the PIAA's Preliminary Objections

After briefing and argument, the trial court issued a thorough and thoughtful 65-page opinion in which it sustained in part and overruled in part the PIAA's preliminary objections.

### 1. The PIAA's Demurrer to Plaintiffs' Negligence Claims
#### a. Duty/Assumption of the Risk

The trial court began by explaining that judicial authority often describes "assumption of the risk" as a counterpart to "lack of duty." See, e.g.

Carrender v. Fitter, 469 A.2d 120, 125 (Pa. 1983); Howell v. Clyde, 620 A.2d 1107 (Pa. 1993) (plurality op.); Montagazzi v. Criscl, 994 A.2d 626 (Pa. Super. 2010). However, as the Restatement (Second) of Torts suggests, analysis of the concept as a defense may be more appropriate than in terms of duty. See RESTATEMENT (SECOND) TORTS §496C, cmt. d. (analysis as a defense would be most appropriate in a case in which the court finds there is a duty in the first instance, and the issue is subjective knowledge of the hazard and a knowing and voluntary decision to proceed in the face of that danger.).

Here, as the basis for its objection based on lack of duty, the PIAA argued that the Complaint's averments were not sufficient to show the PIAA had a duty in the traditional sense. The PIAA argued Plaintiffs assumed the risk in the traditional sense of voluntarily participating in a contact sport, subjectively knowing of the risk of injury, including concussions, and yet nevertheless proceeded in the face of danger. However, in support of its objection based on assumption of the risk, the PIAA also suggested that, in terms of lack of duty, it had no duty under application of the "inherent risk/no duty" rule. As additional support for its claim that Plaintiffs assumed the risk of injury, the PIAA pointed to the fact that Plaintiffs and their parents signed the CIPPE forms. These forms contained information about concussions and traumatic brain injuries, and an acknowledgment by the signer of familiarity with the nature and risks of concussion and traumatic brain injuries while participating in interscholastic athletics, "including the risks associated with continuing to compete after a concussion or traumatic brain injury." Tr. Ct., Slip Op., at 16-17 (quoting Prelim. Objs., Ex. D, §3 (CIPPE Form)). The trial court

analyzed the intertwined issues of "lack of duty" in connection with "assumption of risk."

Initially, however, the trial court discussed the SYSA, which Plaintiffs alleged provided general standards for interscholastic athletics. The trial court noted Plaintiffs did not rely on the statute as creating a duty on the part of the PIAA, but rather they asserted the SYSA generally described minimum standards of care for interscholastic athletics.

In their Complaint, Plaintiffs refer to the Pennsylvania Legislature's enactment of the SYSA, which, according to the Complaint "generally described standards for interscholastic athletics: immediate removal from play for anyone suspected of having a concussion; written clearance by a licensed medical professional before returning to play; concussion training courses for coaches prior to every season; and[,] signing of a concussion information sheet by the parent and student athlete prior to every school year." Tr. Ct., Slip Op., at 17-18 (quoting Compl. at ¶47).

The PIAA argued that, by implication, Plaintiffs were relying on the SYSA to prove a duty imposed on the PIAA. The PIAA then presented its responsive argument, pointing out that the SYSA does not impose any duty on the PIAA, but only mandates action by the Department of Health, Department of Education, school entities, game officials, coaches, trainers and physicians. The trial court noted the SYSA clearly does not impose a duty on the PIAA.

16

However, the trial court explained, Plaintiffs were not relying on the SYSA to support their argument on the "duty" issue. Plaintiffs were not contending the SYSA imposes a duty on the PIAA, but rather they asserted the SYSA generally describes minimum standards of care for interscholastic athletics. As a result, the trial court determined it was not necessary to engage in any discussion that the SYSA might by implication impose a statutory duty on the PIAA. Rather, Plaintiffs' claim was solely that of a non-statutory duty. Nevertheless, the trial court deemed the SYSA relevant to the PIAA's argument that the Complaint's averments were insufficient to support a finding of "duty," and that the Complaint raised issues that were not proper for consideration by the courts.

### b. Inherent Risk/No-Duty Rule

Before the trial court, the PIAA argued the Complaint revealed that, as a matter of law, Plaintiffs' voluntary participation in sports that involve obvious inherent risk of injury eliminated any duty of care toward Plaintiffs. In support, the PIAA relied on the "no-duty/inherent risk" doctrine, buttressed by Plaintiffs' execution of the CIPPE forms which, according to the PIAA, contained acknowledgment and acceptance of the risks of participation in football and softball. The trial court noted that the PIAA cited to no authority defining the parameters of the inherent risk concept. Nevertheless, the trial court noted, "[the] no-duty rule provides that a defendant owes no duty of care to warn, protect or insure against risks which are common, frequent, expected and inherent in an activity." Vinikoor v. Pedal Pa., Inc., 974 A.2d 1233, 1240 (Pa. Cmwlth. 2009).

The trial court noted it may not logically be disputed that playing football (Hites and Teolis) or softball (Zingaro) involves an inherent risk of injury,

17

including the risk of head trauma and possible concussion. However, as added support for its argument, the PIAA pointed to provisions in its Constitution and the CIPPE form, which specifically apprise students and parents of the risks of participation, with specific reference to concussions in the CIPPE form.

The trial court pointed out that Plaintiffs argued they were not basing their claims on the occurrence of the initial contact and head trauma, but rather on the PIAA's negligent creation and enforcement of concussion protocols (both pre- and post-injury) that caused Plaintiffs to experience a continuing injury as they attempt to recover. Plaintiffs further pointed to the PIAA's alleged improper administration of baseline testing that was causatively linked to post-injury evaluation and treatment, and the PIAA's omission in protocol enforcement and provision of paid-for resources, none of which are risks that are common, frequent, expected, and inherent in the activities at issue. Plaintiffs argued the Complaint's averments supported their claims that the risks of which they complained were not inherent risks, and the PIAA deviated from established custom in the subject school sports activities, and Plaintiffs' averments were sufficient to withstand a demurrer and permit the case to proceed to discovery.

In response, the trial court determined the Complaint did not aver facts to support Plaintiffs' contention that the "deviation from established custom exception" applies. Tr. Ct., Slip Op., at 20. To that end, the trial court explained the Complaint lacked factual averments to show established customs regarding concussion injuries practiced generally that were relevant to the issues here, as well

18

as any facts to support Plaintiffs' claim that the PIAA deviated from protocols and practices customarily followed in general.

Remaining for discussion, the trial court stated, was Plaintiffs' contention that the occurrence of head trauma was the risk accepted by participating in contact sports, not the risk created by the PIAA's alleged failure to create, implement and enforce proper protocols, to provide for proper baseline testing, to train and educate personnel, as well as other alleged pre- and post-concussion negligent conduct. Plaintiffs argued the latter were not common, frequent and expected risks of participating in contact sports; therefore, they were excepted from operation of the inherent risk/no duty rule that would relieve the PIAA from a duty of care. In resolving this issue, the trial court deemed relevant the Superior Court's decision in Craig v. Amateur Softball Association of America, 951 A.2d 372 (Pa. Super. 2008). Ultimately, and as explained more fully below, the trial court determined that dismissal of Plaintiffs' negligence claims on the basis of the "inherent risk/no-duty" rule at this stage would be premature.[3]

### c. Duty as an Element of a Negligence Cause of Action

The trial court next considered whether, regardless of the applicability of the "inherent risk/no duty rule," the Complaint's averments showed, pursuant to a basic negligence analysis, a duty of care toward Plaintiffs could be imposed based on the circumstances described in the Complaint.

---

[3] The trial court further explained that: (1) in light of the fact that, to prove the defense of assumption of the risk, a defendant must prove a plaintiff's subjective knowledge of the specific risk and a voluntary and knowing acceptance of that risk; (2) accepting the Complaint's averments as true; and, (3) affording Plaintiffs all reasonable inferences from those averments, it was not possible to conclude with certainty that the complaint failed to state a viable claim for negligence on the ground that Plaintiffs subjectively understood all the risks involved, and knowingly volunteered to participate and assume those risks.

19

In considering this issue, the trial court examined our Supreme Court's decision in Althaus ex rel. Althaus v. Cohen, 756 A.2d 1166 (Pa. 2000), which set forth five factors to be weighed in determining whether a duty exists in a particular case: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty on the actor; and, (5) the overall public interest in the proposed solution. The trial court applied these factors to the various allegations of negligence averred in Plaintiffs' Complaint.

### i. Paragraphs 76(d), (e) and (g) of the Complaint

The trial court first explained that, given the general and conclusory nature of the allegations in paragraphs 76(d), (e) and (g) (regarding the PIAA's alleged failure to provide proper planning for injuries and emergencies, failure to prioritize a safety culture for educating student-athletes on the issues related to concussions, and failure to provide a safe playing environment), except for a determination of whether a relationship existed between the PIAA and Plaintiffs, the trial couurt could not conclude the remaining Althaus factors weighed in favor of the imposition of a duty of care toward Plaintiffs. Thus, the trial court sustained the PIAA's demurrer to those averments.

### ii. Paragraphs 76(j) and (k) of the Complaint

Next, as to the allegations of negligence averred in paragraphs 76(j) and (k) (regarding the PIAA's alleged failure to provide information and resources), the trial court explained, with the exception of the relationship between the PIAA and Plaintiffs, the remaining Althaus factors weighed against imposition of a duty.

20

When applying the duty analysis, the trial court stated, PIAA is not liable. To that end, the trial court determined, although a relationship between the PIAA and Plaintiffs might be inferred, the factors of the social utility of the PIAA's activities, the nature of the risk and foreseeability, the consequences to the PIAA, and the overall public interest, weighed against imposition of a duty.

Further, the trial court explained, as explained more fully below, in this tort suit for personal injury, neither proximate cause nor actual cause of the complained of injuries could be shown.

Finally, the trial court stated, it was not aware of any authority that mentions or approves the viability of a negligence or tort cause of action for failing to provide information and resources under the circumstances averred in the Complaint. In any event, the trial court explained, it would not be sound policy to expand tort liability to encompass such a claim.

As such, the trial court sustained the PIAA's demurrer to Plaintiffs' damage claim based on the PIAA's alleged negligent failure to inform student-athletes of available financial resources and to take action to provide those resources to student-athletes and their families, as alleged in paragraphs 76(j) and (k) of the Complaint as well as paragraphs 6(f) and 59, and as may be alleged elsewhere in the Complaint.

### iii. Paragraphs 76(a)-(c), (f), (h) and (i) of the Complaint

As to paragraphs 76(a)-(c), (f), (h) and (i), incorporating paragraphs 6(a) and (e) and supplemented by paragraphs 6(c) and (d), which relate to the duty

21

owed to the individual named Plaintiffs, the trial court first noted its analysis was impacted by the fact that the SYSA became effective in July 2012, after the concussion suffered by Hites, but before the concussions suffered by Zingaro and Teolis.

As to Hites, the trial court determined paragraphs 76(c) and the latter part of subparagraph (f) (alleging the PIAA failed to provide adequate medical personnel and consistent and ongoing warnings of long term risks and adequate post-concussion care or monitoring), the trial court determined the Althaus factors weighed against imposition of a duty on the PIAA.

However, as to paragraph 6(c) (the PIAA's alleged failure to *require* qualified medical personnel), accepting the Complaint's averments as true at this stage, the trial court stated, it must be accepted that the failure to require and enforce proper screening, baseline testing and interpretation, and proper use of baseline testing (Compl. at ¶76(a)); failure to fully educate athletic departments and trainers regarding concussion diagnoses, and protocols, and to provide ongoing education to parents and student-athletes (Compl. at ¶76(b)); failure to provide consistent and ongoing warning of long term risks (Compl. at ¶76(f)); failure to create, implement and enforce diagnosis protocols, immediate access to baseline testing and "sideline testing for continuation of practice or play" (Compl. at ¶76(h)); failure to create, implement and enforce proper return-to-activity protocols after a concussion diagnosis (Compl. at ¶76(i)); failure to require qualified medical personnel (Compl. at ¶6(c)); and, failure to mandate removal of athletes (Compl. at ¶6(d)), could conceivably have led to increased harm to student-athletes suffering concussions.

22

Likewise, the trial court determined, accepting the Complaint's factual allegations as true, which suggest the PIAA's past awareness of the existence of the protocols and policies that Plaintiffs allege were accepted and established, and the potential consequences of failure to comply with those standards, Plaintiffs averred sufficient facts to support a claim that the risk of some level of exacerbation of harm as a result of the failure to comply with those responsibilities might have been foreseeable.

The trial court further explained it also appeared that imposing a duty to provide and perform the responsibilities identified in Paragraph 76(a), (b), (h) and (i), and the remaining portion of subparagraph (f), as well as paragraphs 6 (c) and (d) would adversely affect the PIAA's ability to perform its responsibilities in their present form. However, the trial court reiterated, this case is now only at the preliminary objection stage. The trial court stated there was insufficient record evidence from which such findings regarding Paragraph 76(a), (b), (h) and (i), and the second part of subparagraph (f), as well as paragraphs 6(c) and (d), may be made. As such, the trial court determined a final evaluation and decision regarding the consequences of imposition of a duty as to the responsibilities suggested in paragraphs 76(a), (b), (h) and (i), and the remaining portion of subparagraph (f) (regarding warning of risks), as well as in paragraphs 6(c) and (d), in Hites' case, must await discovery and further proceedings. Therefore, the trial court stated, the task of weighing the social utility of the PIAA's conduct against the risk and foreseeability of the harm must likewise be postponed.

23

Finally, the trial court stated, the public should be interested in adopting practical measures to enhance the safety of participation in interscholastic contact sports. At this stage, the trial court explained, in Hites' case, and accepting the Complaint's averments as true, as to paragraphs 76 (a), (b) (h) and (i), and the remaining part of paragraph (f), and as to paragraphs 6(c) and (d), it appeared that Althaus factors one and five (relationship between the parties and overall public interest in the proposed solution) weighed in favor of finding the existence of a duty, and that factor two (the social utility of the actor's conduct) weighed in favor of the PIAA. The trial court explained that a final determination of foreseeability (factor three) and the weight of factor three would depend on findings of fact that may be made after development of an evidentiary record, and although it seemed likely that factor four (the consequences of imposing a duty on the actor) would weigh in favor of the PIAA, there was insufficient development of a record at this point to sustain the PIAA's claim that imposition of a duty would impose an impossible or, at least, impractical burden. Therefore, as to Hites' claims, the trial court overruled the PIAA's demurrer to paragraphs 76(a), (b), (h) and (i), and the identified parts of subparagraph (f), as well as paragraphs 6(c) and (d), with further ruling to await the close of the pleadings and discovery. See, e.g., Barton v. Lowe's Home Cntrs., Inc., 124 A.3d 349, 360 (Pa. Super. 2015) (although complaint may survive demurrer, issue of "duty" is to be revisited, if warranted, based on evidence submitted at later phases of the case).

Next, as to Plaintiffs Zingaro and Teolis, the trial court stated, the concussions suffered by those Plaintiffs occurred after the SYSA's effective date. Thus, the SYSA must be considered when analyzing Plaintiffs' claims based on the

24

allegations of the PIAA's duty toward Zingaro and Teolis. The trial court noted the SYSA establishes responsibility in interscholastic athletics for education regarding concussions and consequences, rules for removal from play and return to play, training for coaches, a requirement that the governing body of a school establish penalties for a coach found in violation of the removal from and return to play rules set forth in the SYSA, and provides for coaches' immunity from civil liability.

The trial court stated it must be concluded that the Legislature has assumed responsibility for establishment of: rules and policy for education of student-athletes and parents regarding concussions and consequences; training of coaches who are to be responsible for removal from and return to play decisions; decisions to be based on opinions of medical professionals; authority for schools to designate the medical professional who is to provide opinions regarding return to play decisions; minimum penalties for violation of the rules regarding removal from and return to play, to be enforced by the school; and, immunity of a coach from civil liability.

Consequently, whether analyzed pursuant to the five Althaus factors, or notions of public policy, the trial court stated, the SYSA must be considered when evaluating whether a duty should be imposed on the PIAA as a basis for the Complaint's allegations of negligence.

The trial court stated that, given enactment of the SYSA and the Legislature's promulgation of rules and standards as set forth above, with the exception of failure to implement baseline testing averred in paragraphs 76(a) and (h), the consideration of the factor of foreseeability and risk of harm (the third

25

<u>Althaus</u> factor), and the consequences of imposing a duty on the PIAA (the fourth <u>Althaus</u> factor), would seem to weigh against a finding of duty as to paragraphs 76(b), (c), (f), (i), and the remaining allegations in subparagraph (h), as well as paragraph 6(c) and (d).

In addition, the trial court stated, notions of practicality apply, considering the problems that would arise from an obligation to adopt policies in response to Plaintiffs' allegations of deficiencies in enforcement, training, actions regarding medical professionals, and other areas, that might conflict, or be inconsistent, with the rules and policy established by the Legislature or by the Departments of Health or Education, schools and coaches, and the Center for Disease Control and Prevention.

Ultimately, the trial court stated, bound by its mandate to accept all relevant averments from the Complaint as true, as well as all reasonable inferences from those averments, the ruling in the cases of Zingaro and Teolis must be the same as in the case of Hites. Thus, the trial court sustained the PIAA's demurrer based on failure of the Complaint to aver sufficient facts to support imposition of a duty with regard to paragraph 76(c) and that part of subparagraph (f) that alleges failure to provide post-concussion care and monitoring. The trial court overruled the demurrer as to subparagraphs 76(a), (b), (h) and (i), and that part of subparagraph (f) that alleges failure to "provide consistent and ongoing warning of long-term risks" and as to paragraphs 6(c) and (d), with the same comment as was made in the case of Hites. Tr. Ct., Slip Op., at 39. Nevertheless, the trial court acknowledged that the

26

issue of duty would be revisited at succeeding stages of the case, with an eye toward the SYSA, as may be warranted as the record develops.

## d. Proximate Cause

The trial court next examined the issue of whether Plaintiffs sufficiently pled proximate cause. As explained above, the trial court sustained the PIAA's demurrer based on failure to aver facts supporting the imposition of a duty as to paragraphs 76 (d), (e) and (g) of the Complaint. Further, the trial court sustained the PIAA's demurrer to that portion of Plaintiffs' negligence claim set forth in paragraphs 76 (j) and (k). Moreover, the trial court explained, if those allegations were analyzed based on the factors listed in Section 433 of the Restatement (Second) of Torts (stating three factors for determining whether negligent conduct is a substantial factor in producing an injury), an inference supporting a finding of proximate cause could not be made.

In addition, the trial court observed, after the initial impacts occurred, the alleged failures to recognize and diagnose concussion symptoms, improper permission of return to play, failure to direct appropriate post-concussion symptom testing and medical treatment, and improper permission to return to play after medical clearance, were committed, and made, by school and medical personnel.

The trial court further stated, although the Complaint sets forth a conclusion that the PIAA failed to enforce its rules and regulations, it does not aver facts to support the conclusion. Specifically, the Complaint does not allege the manner in which lack of enforcement relates to the actions of the school and medical

27

personnel involved in the different school districts attended by each of the individual Plaintiffs.

The trial court also explained that, although it is a court's responsibility to determine from the facts pled whether any viable cause of action exists, it is a plaintiff's burden to plead sufficient facts upon which a court may make that determination. Without averments providing the facts upon which Plaintiffs were relying to show the requisite connection to the complained of harm, the trial court determined it was required to sustain the PIAA's demurrer to Plaintiffs' cause action with regard to Plaintiffs' claims concerning: failure to provide ongoing education with parents and student-athletes as alleged in paragraph 76(b); failure to provide medical equipment described in paragraph 76(c); the negligent conduct averred in paragraphs 76(d), (e), (g), (j) and (k); and, the lack of enforcement alleged in paragraphs 76(h) and (i) and elsewhere in the Complaint.

On the other hand, the trial court explained, the allegations of negligence surviving the demurrer based on lack of causation were the PIAA's alleged failure to: require proper baseline testing and interpretation in paragraph 76(a); educate athletic departments and trainers in paragraph 76(b); provide warnings of long-term risks in paragraph 76(f); create and implement protocols in paragraphs 76(h) and (i); require qualified medical personnel in paragraph 6(c); and, mandate removal from play in paragraph 6(d).

## 2. The PIAA's Preliminary Objection that Plaintiffs' Claims are Non-Justiciable

28

The trial court next considered the PIAA's preliminary objection that the Complaint presented a non-justiciable issue for the legislature rather than the courts. The trial court explained there was no allegation that the Pennsylvania Legislature appointed the PIAA as the agency responsible for adopting, implementing and enforcing rules and regulations to govern recognition, response, treatment, rehabilitation and other issues involving concussion injuries incurred in interscholastic sports.

As noted above, the trial court indicated, the Pennsylvania Legislature adopted legislation that: imposes obligations on the Department of Health and the Department of Education to develop and disseminate guidelines and other information regarding the nature and risk of concussion and traumatic brain injuries; establishes procedures that coaches and school officials must follow regarding removal from play, return to play, and training; and, requires schools to establish penalties for a coach's non-compliance. Significantly, the SYSA also provides for immunity from civil liability for coaches who comply with its requirements.

In addition, the Legislature enacted legislation directing the board of school directors in every school district to "prescribe, adopt, and enforce such reasonable rules and regulations as it may deem proper, regarding … the management, supervision, control, or prohibition of exercises, athletics, or games of any kind …." Section 511(a)(1) of the Public School Code of 1949 (School Code).[4]

---

[4] Act of March 10, 1949, P.L. 30, as amended, 24 P.S. §5-511(a)(1).

29

With the enactment of the SYSA, the trial court explained, the Legislature assigned responsibility in the areas of education, training, removal from play, return to play and adoption and enforcement of penalties to state agencies and school districts. The trial court further stated, to hold the PIAA accountable for failure to implement policies, protocols and rules advocated by Plaintiffs might place the PIAA in the dilemma of deciding whether to promulgate and enforce protocols and rules that could be inconsistent or in conflict with the legislatively promulgated rules and penalties. Because involving subjects in an area in which the Legislature acted, the trial court stated, with the exception of allegations relating to baseline testing, it may be argued that the claims of Zingaro and Teolis impermissibly impinge on the legislative scheme and the Legislature's assumption of responsibility regarding the subject of response to student-athlete concussion related events.

Ultimately, the trial court determined, absent development of a record to provide information as to the specific parameters of Plaintiffs' claims, it could not be determined with the requisite degree of certainty the extent to which those claims might improperly interfere and conflict with legislative provisions already in place, and the Legislature's assumed role and responsibility to investigate, deliberate and enact legislation or take other action regarding the subject matter and issues that Plaintiffs are attempting to resolve in the judicial sphere. As such, the trial court overruled the PIAA's demurrer to Plaintiffs' negligence cause of action based on non-justiciability, only to be confronted as the case develops.

For these reasons, the trial court issued an order sustaining in part and overruling in part the PIAA's preliminary objections.[5]

### D. The PIAA's Petition for Permission to Appeal the Trial Court's Interlocutory Order

Thereafter, the PIAA filed an application, asking the trial court to amend its order sustaining in part and overruling in part the PIAA's preliminary objections to certify this case for immediate appeal pursuant to Section 702(b) of the Judicial Code, 42 Pa. C.S. §702(b) (relating to interlocutory appeals by permission). Plaintiffs opposed the PIAA's application.

Ultimately, the trial court issued an opinion in which it first explained that a complicating factor in arriving at an appropriate resolution of the PIAA's

---

[5] The PIAA also raised several other preliminary objections to the Complaint. More particularly, the PIAA objected that Plaintiffs failed to allege facts that would allow them to prevail on their claim for a medical monitoring trust fund under Pennsylvania law. Further, the PIAA objected to Plaintiffs' claims for equitable relief because of the existence of a full, complete and adequate non-statutory remedy at law. Additionally, the PIAA objected to the inclusion of alleged impertinent matter in the Complaint. The PIAA also objected to Plaintiffs' claim of class representation on the ground that it was clear from the facts averred that Plaintiffs could not satisfy the elements required to maintain a class action suit. Finally, the PIAA objected to Plaintiffs' claim for attorney fees on the ground that attorney fees are non-recoverable in these circumstances.

As to the these preliminary objections, the trial court: (1) sustained the PIAA's demurrer to Plaintiffs' medical monitoring claim (Count II of the Complaint) on the ground that case law makes clear that a medical monitoring cause of action was only adopted in toxic tort cases, see Redland Soccer v. Dep't of Army, 696 A.2d 137 (Pa. 1997); (2) sustained the PIAA's demurrer to Plaintiffs' claim for equitable relief (Count III of the Complaint) on the ground that the equitable relief sought by Plaintiffs would constitute overreaching into the legislative sphere; (3) sustained in part and overruled in part the PIAA's preliminary objection that the Complaint contained impertinent matter; and, (4) sustained in part and overruled in part the PIAA's preliminary objection to the suit proceeding as a class action. The trial court also denied the PIAA's motion to strike Plaintiffs' request for attorney fees at this stage.

The trial court's rulings on these issues are not before us in this appeal.

31

application was the fact that, in response to the trial court's order sustaining in part and overruling in part the PIAA's preliminary objections, Plaintiffs filed a first amended complaint to which the PIAA filed preliminary objections that were awaiting argument. However, the trial court explained, the first amended complaint did not eliminate any of the issues that were the subject of the trial court's prior rulings. Thus, the trial court opined that its rulings on the issues set forth above involved controlling questions of law as to which there was a substantial ground for difference of opinion, and that an immediate appeal of those rulings might materially advance the ultimate termination of the matter. As such, the trial court granted the PIAA's application to certify this case for immediate appeal under 42 Pa. C.S. §702(b).

The PIAA subsequently filed a petition for permission to appeal to this Court, which Plaintiffs opposed. Ultimately, this Court issued an order granting the PIAA's petition limited to the four issues stated above. This matter is now before us for disposition.

## II. Issues

As stated above, this Court granted the PIAA's petition for permission to appeal the trial court's interlocutory order to consider the following four negligence-based issues: (1) whether the claims pled are non-justiciable based on the effect of the SYSA; (2) whether Plaintiffs are barred from recovery, as a matter of law, because of the "inherent risk/no duty" rule; (3) whether Plaintiffs are unable to establish the requisite "duty" as an element of their negligence cause of action because the "duty" may not be imposed on the PIAA as a matter of public policy; and, (4) whether Plaintiffs failed to aver facts to show the requisite causation.

32

## III. Discussion

With regard to the applicable standards in reviewing a trial court's rulings on preliminary objections, in Hill v. Slippery Rock University, 138 A.3d 673, 676-77 (Pa. Super. 2016), appeal denied, 164 A.3d 491 (Pa. 2017), the Superior Court explained:

> A preliminary objection in the nature of a demurrer is properly granted where the contested pleading is legally insufficient. Preliminary objections in the nature of a demurrer require the court to resolve the issues solely on the basis of the pleadings; no testimony or other evidence outside of the complaint may be considered to dispose of the legal issues presented by the demurrer. All material facts set forth in the pleading and all inferences reasonably deducible therefrom must be admitted as true.

> In determining whether the trial court properly sustained preliminary objections, the appellate court must examine the averments in the complaint, together with the documents and exhibits attached thereto, in order to evaluate the sufficiency of the facts averred. The impetus of our inquiry is to determine the legal sufficiency of the complaint and whether the pleading would permit recovery if ultimately proven. This Court will reverse the trial court's decision regarding preliminary objections only where there has been an error of law or abuse of discretion. When sustaining the trial court's ruling will result in the denial of claim or a dismissal of suit, preliminary objections will be sustained only where the case is free and clear of doubt.

> Thus, the question presented by the demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible. Where a doubt exists as to whether a demurrer should be sustained, this doubt should be resolved in favor of overruling it.

### A. Justiciability of Plaintiffs' Claims Based on the SYSA

33

## 1. Contentions

The PIAA first argues that, as evidenced by the scope of and duties imposed by SYSA, Plaintiffs' negligence claims involve non-justiciable issues reserved for the Legislature. Thus, the PIAA asserts, the courts must not usurp the Legislature's policy and rule making authority by imposing duties clearly not required by statute.

The PIAA contends Pennsylvania courts hold "[t]he enunciation of matters of public policy is fundamentally within the power of the legislature." Lurie v. Republican Alliance, 192 A.2d 367, 370 (Pa. 1963). Thus, "[w]hile the courts may in a proper case, in the absence of a legislative pronouncement, determine what is against public policy … [i]t is only when a given policy is so obviously for or against the public health, safety, morals or welfare that there is a virtual unanimity of opinion in regard to it, that a court may constitute itself the voice of the community in so declaring." Id. (citation and internal quotation omitted); see also Atcovitz v. Gulph Mills Tennis Club, Inc., 812 A.2d 1218 (Pa. 2002) (declining to impose a duty on club to maintain defibrillator on its premises, principally on the ground that legislature carefully regulated use of such devices without imposing a duty on business operators to maintain such equipment); Pierscionek v. Illinois High Sch. Ass'n, No. 14 CH 19131 (Ill. Cir. Ct. filed Oct. 25, 2017) (trial order), 2015 WL 6550826 at *1 (unreported) (holding, in a similar concussion case that such issues were a public policy dispute for the legislature and school boards, and noting injunctive relief would improperly interfere with "the distinct province of the legislature.")

By enacting the SYSA, the PIAA maintains, the Pennsylvania Legislature made clear that the issues presented here and duties alleged by Plaintiffs are matters reserved for the Legislature. The PIAA argues the SYSA is a comprehensive act designed to protect and educate students and the public, which places affirmative burdens on the Departments of Health and Education, school entities, game officials, coaches, trainers, physicians and others regarding prevention and treatment of head injuries in youth sports. Despite expressly choosing to place duties on all of these persons and entities, the PIAA contends, there is no dispute the Legislature imposed no duty on PIAA.

The PIAA further asserts the SYSA requires the Departments of Health and Education to develop and publicize information to "educate students participating in or desiring to participate in an athletic activity, their parents and their coaches about the nature and risk of concussion and traumatic brain injury, including the risks associated with continuing to play or practice after a concussion or traumatic brain injury." See Section 3(a) of the Act, 24 P.S. §5323(a). The SYSA also requires students and parents to acknowledge receipt and review of "a concussion and traumatic brain injury information sheet." Id. Thus, the PIAA contends, the SYSA includes guidelines and mandates to make certain that students and parents are educated and receive warnings regarding the risks of head injuries.

The PIAA maintains the SYSA is directed to "school entit[ies]," which the School Code defines as "[a] public school, school district, nonpublic school or private school in this Commonwealth other than a private or nonpublic school which elects not to become a member of the [PIAA]." Section 1602-A of the School

35

Code, 24 P.S. §16-1602-A.[6] Such school entities "may"—but are not required to—hold seasonal informational meetings for competitors "regarding concussions and other head injuries, the importance of proper concussion management and how preseason baseline assessments can aid in the evaluation, management and recovery process." See Section 3(b) of the SYSA, 24 P.S. §5323(b). These informational meetings may include physicians, neuropsychologists, athletic trainers and physical therapists. Id. Thus, the PIAA argues, the Legislature addressed the obligations of PIAA members. Clearly, it asserts, the Legislature was aware of the PIAA and its member schools, but chose to impose only upon the schools a suggestion to hold informational meetings.

In addition, the PIAA contends, the SYSA is directed to coaches, game officials, and medical professionals. Thus, removal from play decisions and the responsibility to remove concussed players rests with those individuals. Section 3(c) of the SYSA, 24 P.S. §5323(c). Coaches may not permit a concussed athlete to participate unless and until the athlete is cleared in writing by an "appropriate medical professional," who may be designated by "the governing body of a school entity." Section 3(d) of the SYSA, 24 P.S. §5323(d). Ultimately, if a coach is found to be in violation of the removal from or return to play subsections, the SYSA requires the governing body of a school entity to establish the penalties enumerated by the statute. Section 3(f) of the SYSA, 24 P.S. §5323(f). The PIAA also asserts coaches are charged with completing an annual concussion management certification training course offered by the Center for Disease Control, the National Federation of State High School Associations, or another approved provider.

---

[6] Section 1602-A was added by the Act of November 22, 2000, P.L. 672.

Section 3(e) of the SYSA, 24 P.S. §5323(e). Thus, the PIAA maintains, the SYSA places the burden on coaches and medical professionals, not the PIAA, to become educated regarding the proper handling of concussions and removal from or return to play decisions.

Finally, the PIAA points out, "sponsors of youth athletic activities not specifically addressed by [the SYSA] are encouraged to follow the guidance set forth in [SYSA]." Section 3(g) of the SYSA, 24 P.S. §5323(g). The PIAA contends, although it is not clear that the PIAA is a "sponsor of youth athletic activities," even if it is, the SYSA only "encourages" such sponsors to follow its guidance, expressly choosing not to impose any mandated burdens or duties on any person or entity involved in youth sports other than as expressly stated. Id.

The PIAA argues that, despite the broad scope and direct relevance of the SYSA to the issues presented here, as recognized by Plaintiffs and the trial court, the SYSA imposes no duty on the PIAA. It asserts that, to the extent the Legislature wished to express any opinion regarding or impose duties on PIAA or any other entities, it could and would have here, as it expressly addressed many persons and entities regarding these issues. In so doing, the PIAA contends, the Legislature also expressed its intentions by excluding the PIAA. It maintains Pennsylvania courts observe the statutory interpretation rule of *expressio unius est exclusio alterius* (the express mention of a specific matter in a statute implies the exclusion of others not mentioned).

As a result, the PIAA argues, the Legislature has spoken regarding the imposition of relevant duties and responsibilities and chose not to impose such duties on PIAA. The PIAA asserts this conclusion is bolstered by the fact that the School Code places the duty and responsibility for prescribing, adopting and enforcing rules and regulations regarding the management, supervision, control or prohibition of exercises, athletics or games of any kind on the board of school directors of each school and requires schools to stand *in loco parentis* over children participating in school activities. See Sections 511 and 1317 of the School Code, 24 P.S. §§5-511, 13-1317.

The PIAA maintains the trial court held that further development of a record was necessary to provide information as to the specific parameters of Plaintiffs' claims before determining the SYSA's impact on the negligence claims. To the contrary, the PIAA asserts, no further record is needed to dismiss these claims.[7]

## 2. Analysis

No error is apparent in the trial court's decision to overrule the PIAA's preliminary objection to Plaintiffs' negligence claims on the ground that, based on the enactment of the SYSA, those claims involve non-justiciable issues reserved for the Legislature.

At the outset, we note, because this appeal arises from the trial court's order disposing of the PIAA's preliminary objections to Plaintiffs' original

---

[7] The National Federation filed an *amicus curiae* brief in support of the PIAA.

complaint, we consider the averments in the original complaint, rather than Plaintiffs' first amended complaint (referenced throughout Plaintiffs' brief), in analyzing the issues presented.

The SYSA is comprised of three sections: (1) its "Short title," Section 1 of the SYSA, 24 P.S. §5321; (2) its "Definitions" section, Section 2 of the SYSA; and, (3) a section entitled "Concussions and traumatic brain injuries." Section 3 of the SYSA.

Section 2 of the SYSA contains definitions for the following terms: (1) "appropriate medical professional"; (2) "athletic activity"; (3) "interscholastic athletics"; and (4) "school entity." The term "school entity," which is defined by reference to the School Code, is "a public school, school district, nonpublic school or private school in this Commonwealth other than a private or nonpublic school which elects not to become a member of the association." Id.

Section 3 of the SYSA is divided into several subsections, which: (1) requires the Departments of Health and Education to develop guidelines and other relevant materials to inform and educate students participating in or desiring to participate in an athletic activity, their parents and their coaches about the nature and risk of concussion and traumatic brain injury, including the risks associated with continuing to play or practice after a concussion or traumatic brain injury; (2) permits school entities to hold informational meetings before each athletic season for all ages of competitors regarding concussions and other head injuries, the importance of proper concussion management and how preseason baseline assessments can aid in

39

the evaluation, management and recovery process; (3) sets forth standards for removal from and return to play after a concussion or traumatic brain injury; (4) requires coaches to complete a concussion management certification training course; (5) sets forth penalties for coaches who violate the removal from or return to play requirements; (6) encourages sponsors of youth athletic activities not specifically addressed by the SYSA to follow the SYSA's guidelines; and, (7) sets forth civil liability provisions, which state (a) "nothing in [the SYSA] shall be construed to create, establish, expand, reduce, contract or eliminate any civil liability on the part of any school entity or school employee[,]" Section 3(i)(1) of the SYSA, 24 P.S. §5323(i)(1); and, (b) any coach who acts in accordance with the removal from or return to play requirements shall be immune from civil liability.

Noticeably absent from the SYSA is any mention of the PIAA. Additionally, as to civil liability, the SYSA expressly states that nothing in the SYSA shall be construed to "reduce, contract or eliminate any civil liability on the part of any school entity or school employee." Id. Thus, while the SYSA adds certain responsibilities to school entities and school employees, it does not purport to alter any immunity which may currently exist for them. See M.U. v. Downingtown High Sch. East, 103 F. Supp. 3d 612 (E.D. Pa. 2015). The SYSA does extend immunity to compliant coaches, who may or may not be school employees. In sum, there is no indication that the General Assembly, through enactment of the SYSA, intended to eliminate civil suits such as the suit filed by Plaintiffs here against the PIAA.

In addition, as the trial court properly explained (with emphasis added),

with passage of the [SYSA], the Legislature assigned responsibility in the areas of education, training, removal

40

from play, return to play and adoption and enforcement of penalties to state agencies and to the individual school districts. To hold [the] PIAA accountable for failure to implement policies, protocols and rules advocated by Plaintiffs might place [the] PIAA in the dilemma of deciding whether to promulgate and enforce protocols and rules that could be inconsistent or in conflict with the legislatively promulgated rules and penalties. Because involving subjects in an area in which the Legislature has acted, with the exception of allegations relating to baseline testing, it may be argued that [Zingaro] and [Teolis'] claims impermissibly impinge upon the legislative scheme and the Legislature's assumption of responsibility regarding the subject of response to student athlete concussion related events. …

Without additional development of the record to provide information regarding the specific parameters of Plaintiffs' claims, it cannot be determined with the required degree of certainty the extent to which those claims might improperly interfere and conflict with the legislative provisions already in place, and the Legislature's assumed role and responsibility to investigate, deliberate and enact legislation or take other action regarding the same subject matter and issues that Plaintiffs are attempting to resolve in the judicial sphere.

Consequently, the demurrer to Plaintiffs' negligence cause of action based on [non-justiciability] will be overruled, only to be confronted as the case develops.

Tr. Ct., Slip Op., at 44-45. Thus, dismissal of Plaintiffs' negligence claims based upon the enactment of the SYSA would be premature at this stage.

Further, Atcovitz and Pierscionek, cited by the PIAA are distinguishable. In Atcovitz, our Supreme Court determined that a tennis club did not owe a duty of care to its members to acquire and maintain an automated external defibrillator (AED) on its premises for emergency use. In granting summary

41

judgment in favor of the tennis club, the Court determined the use of AEDs was highly regulated through the former Emergency Medical Services Act[8] (EMS Act) and its regulations, and the club was not required to keep an AED on its premises for use by unqualified and untrained personnel. The Court also determined 42 Pa. C.S. §8331.2 ("Good Samaritan civil immunity for use of [AED]"), which created an exception for imposing liability on untrained individuals who used AEDs in limited emergency situations, did not authorize the use of AEDs by untrained individuals, and it did not impose a duty on the tennis club to acquire and maintain such a device.

First, unlike in Atcovitz, which arose at the summary judgment stage, the case presently before us arises from the trial court's decision on preliminary objections. Additionally, unlike the legislative exclusion of untrained persons from the EMS Act, which implied that untrained individuals were precluded from administering emergency medical services using AEDs, there is no indication here that, through the enactment of the SYSA, the Legislature intended to eradicate negligence claims such as those alleged by Plaintiffs. Indeed, as set forth above, the SYSA expressly states that it is *not* intended to eliminate civil liability.

Further, in Pierscionek, an unreported Illinois case involving claims relating to concussions sustained in high school football, the plaintiff's complaint only contained counts seeking injunctive relief and creation of a medical monitoring

---

[8] Act of July 3, 1985, P.L. 164, as amended, formerly 35 P.S. §§6921-6938. The Emergency Medical Services System Act is now codified at 35 Pa. C.S. §§8101-8157.

fund. At issue in this appeal, however, are only Plaintiffs' negligence claims.[9] Thus, the nature of the relief sought distinguishes this case from Pierscionek.

For all of these reasons, no error is apparent in the trial court's decision to overrule the PIAA's preliminary objection on the ground that the SYSA renders Plaintiffs' negligence claims non-justiciable.

## B. Inherent Risk/No Duty Rule
### 1. Contentions

The PIAA next argues Plaintiffs' negligence claims must be dismissed in their entirety pursuant to the "inherent risk/no duty rule" because the alleged injuries were inherent to the activities in which they occurred. As a general rule, the PIAA asserts, where a plaintiff suffers injury as a result of a risk that is inherent to an activity, Pennsylvania courts deny recovery finding no duty to exist. See e.g., Vinikoor, 974 A.2d at 1240 ("The no-duty rule provides that a defendant owes no duty of care to warn, protect or insure against risks which are common, frequent, expected and inherent in an activity."). The PIAA contends this is particularly true in a sports setting. See Amon v. Shemaka, 214 A.2d 238, 240 n.* (Pa. 1965) ("Every player in and every spectator at a baseball game, a football game, a basketball or soccer or hockey game … knows that an accident or injury may occur in these and in many other sports, and that by playing or watching, he voluntarily assumes the risk of injury. …"). Thus, "if it is determined the no-duty rule is applicable to a negligence claim, a plaintiff will be unable to set forth a *prima facie* case of liability." Craig, 951 A.2d at 376 (citation omitted).

_____

[9] As noted above, the trial court here sustained the PIAA's preliminary objections to Plaintiffs' claims for injunctive relief and creation of a medical monitoring fund, and the propriety of those rulings is not presently before this Court.

Here, the PIAA argues, <u>Craig</u>, and the inherent risk/no duty rule generally require dismissal of Plaintiffs' negligence claims in their entirety. To that end, the PIAA asserts, each of the injuries was the direct result of head trauma occurring in the course of practices or games. Importantly, the PIAA contends, the Complaint is replete with allegations that show head trauma is a common and well known risk in youth sports. <u>See</u> Compl. at ¶¶31, 41, 44, 45. Equally clear from the Complaint, the PIAA argues, is the allegation that the risk of secondary head injury is common and expected in youth sports and such injuries are a prevalent occurrence closely related to the inherent risk of primary injury. <u>See</u> Compl. at ¶¶33-36, 60. The PIAA asserts the Complaint's allegations support a conclusion that primary and secondary injuries are inherent risks associated with playing contact sports.

The PIAA further contends, although Plaintiffs allege they suffered various injuries and impairments as a result of head trauma, the nature of these injuries and whether they were foreseeable are irrelevant to the analysis. Indeed, "[o]nce a risk is deemed inherent, it no longer matters whether the risk is also foreseeable." <u>Craig</u>, 951 A.2d at 376-77. Thus, the PIAA asserts, as all of the injuries result from the inherent risk of head trauma, the inherent risk rule applies, and the PIAA had no duty to prevent such injuries.

Nevertheless, as the trial court explained, Plaintiffs asserted

the occurrence of head trauma is the risk that is accepted by participating in the subject contact sports, not the risk created as a result of PIAA's alleged failure to create, implement and enforce proper protocols; failure to provide for proper baseline testing; failure to train and educate personnel; and other alleged pre- and post-concussion

44

negligent conduct; and that the latter are not common, frequent and expected risks of participating in contact sports, and, therefore, are excepted from operation of the inherent risk/no duty rule that would relieve [the] PIAA from a duty of care.

Tr. Ct., Slip Op., at 21.

The PIAA contends Plaintiffs' Complaint reveals these risks are, in fact, frequent and expected risks. However, the PIAA argues, even if it did not, this is a distinction without a difference. Albeit creatively, the PIAA contends, Plaintiffs merely seek a backdoor to permit them to create liability where none exists. Rather than creating or identifying different "risks," the risk created as a result of these alleged "failures" remains primarily, if not exclusively, head trauma. If the PIAA does not have a duty to prevent the inherent risk of head trauma in contact sports, it asserts, it must not be burdened with a duty to create protocols, testing or education to do so.

Further, the PIAA maintains, this is not a case in which Plaintiffs can, in good faith, argue they were not aware or informed of these inherent risks. Before being permitted to participate in the sports at issue, all student-athletes or their parents receive and are required to sign CIPPE forms, which state, among other things: "I hereby acknowledge that I am familiar with the nature and risk of concussion and traumatic brain injury while participating in interscholastic athletics, including the risks associated with continuing to compete after a concussion or traumatic brain injury." Reproduced Record (R.R.) at 203a. The PIAA argues the CIPPE form plainly advises that head trauma, including trauma resulting from participating after an initial head injury, is a risk inherent to the

45

activity and the fact that (as alleged in the Complaint) all student-athletes are required to acknowledge these risks only bolsters the inherent nature of the risk involved. Compl. at ¶57.

Finally, the PIAA asserts, the very nature of the head trauma at issue and the manner in which it may occur shows both primary and secondary head trauma are inherent risks in youth sports. See Compl. at ¶¶33-36, 60. It contends the occurrence of a prior concussion, prior blow to the head, or multiple blows to the head does not change the nature of the risk involved. Concussions are not always recognizable and, as alleged in the Complaint, signs and symptoms of a concussion are highly variable and individualized, and no two concussions are exactly alike. Id. at ¶33. Thus, the PIAA maintains, to hold that secondary head trauma is not an inherent risk would place a burden on the PIAA to stop play and perform extensive testing each time a blow to the head occurs, regardless of the immediate presence or absence of outward signs of concussion. The PIAA argues this absurd result would severely impair, if not destroy, many interscholastic sports. See Mayall v. USA Water Polo, Inc., 174 F. Supp. 3d 1220, 1227 (C.D. Cal. 2016) (risks of primary and secondary concussions are inherent to water polo; discussing detrimental impact of a contrary finding on the "fundamental nature" of the sport).

In sum, the PIAA argues, contrary to the trial court's ultimate conclusion, no amount of discovery or further pleading is needed to determine the nature of the risk or the appropriate application of the inherent risk/no duty rule. The only risk at issue is the risk of head trauma and that risk is inherent in any

contact sport. As a result, the PIAA asserts the no duty/inherent risk rule bars Plaintiffs' negligence claims.

## 2. Analysis

We discern no error in the trial court's decision to overrule the PIAA's preliminary objection on the basis of the "inherent risk/no duty" rule at this early stage of the litigation.

The "inherent risk/no duty" rule provides that a defendant owes no duty of care to warn, protect, or insure against risks which are "common, frequent and expected" and "inherent" in an activity. Craig, 951 A.2d at 375-76 (quoting Jones v. Three Rivers Mgmt. Corp., 394 A.2d 546, 551 (Pa. 1978)). If it is determined the no-duty rule applies to a negligence claim, a plaintiff will be unable to set forth a *prima facie* case of liability. Id.

In Craig, the plaintiff was struck in the head by a softball while playing in a game organized under the Amateur Softball Association of America's (ASA) rules. The plaintiff was not wearing a helmet when he was struck. The plaintiff filed suit against the ASA alleging he suffered serious injuries as a result of the accident. He alleged the ASA had a duty to recommend or mandate that he wear a helmet. Ultimately, the trial court granted the ASA's motion for summary judgment based on the inherent risk/no duty rule. On the plaintiff's appeal, the Superior Court affirmed.

47

More particularly, the Superior Court rejected the plaintiff's argument that the risk of being struck in the head by a ball while running the bases, thrown with such force that the plaintiff's skull was crushed was not a risk "inherent" to the game of softball. The Superior Court explained the plaintiff's argument "confuse[d] the concepts of risk and result. The risk at issue in this matter is being struck by an errant softball; the risk is not the injuries that resulted from being struck." Id. at 376. The Superior Court also rejected the plaintiff's contention that the ASA owed him a duty of care because it was foreseeable that he could be struck with a softball during play, stating:

> While there is no question foreseeability is a relevant consideration in determining whether a duty of care is owed as a general matter, [the plaintiff's] contention is premised on flawed logic. All inherent risks which fall within the parameters of the no-duty rule are, by definition, foreseeable. Once a risk is deemed inherent, it no longer matters whether the risk is also foreseeable. The inherency determination mandates application of the no-duty rule *ab initio*. In other words, the issue of foreseeability is ancillary to the inherency determination.

Id. at 377.

> Here, as the trial court aptly observed (with emphasis added):

> Acknowledging Plaintiffs' argument that the Complaint's averments of negligence do not involve the initial contact itself, concussions incurred, and usual resulting harm, but rather consequences suffered as a result of [the] PIAA's alleged pre- and post-concussion negligent conduct; accepting the [c]omplaint's averments as true; affording Plaintiffs the benefit of all reasonable inferences from those averments; and considering the concept of intervening cause; it may not properly be concluded at this point that the [c]omplaint, on its face,

48

shows with the required certainty that, as a matter of law, Plaintiffs are barred from recovery by application of the 'inherent risk/no-duty' rule. The 'inherent risk/no duty' doctrine applies undoubtedly to the concussions themselves, but might not apply to harm that Plaintiffs are able to show was due to [the] PIAA's alleged pre- and post-concussion negligent conduct as averred in the [c]omplaint, depending, *inter alia*, upon the nature of the harm suffered by Plaintiffs; the cause of the harm; the extent to which the harm could, as a matter of law, be considered to be an expected consequence; and applicability of the [Superior] Court's reasoning in Craig. If it is determined that liability is not barred by the 'inherent risk/no duty' doctrine, then the alleged negligent conduct might in turn be found to constitute a breach of duty imposed pursuant to basic principles of negligence law.

The issue may be presented again after the pleadings are closed and discovery has been conducted. If, pursuant to Craig, the risk is suffering head trauma, triggering the inherent risk/no duty rule with respect to all consequences of the injury incurred, liability will be barred unless an exception clearly appears from the pleadings and … is supported by the evidence.

Tr. Ct., Slip Op., at 23 (internal citation omitted). While we are skeptical of Plaintiffs' "splintered" approach to defining risk, we generally agree with the trial court that dismissal of Plaintiffs' negligence claims on the basis of the "inherent risk/no duty" rule would be premature at this stage.

To that end, our review of the averments set forth in the Complaint reveals that Plaintiffs do not focus solely on the initial contact itself, concussions incurred, and the usual resulting harm. Instead, Plaintiffs also allege they suffered harm as a result of the PIAA's alleged pre- and post-concussion negligent conduct. See Compl. at ¶¶6, 53, 54, 58, 59, 60, 71, 73-78. Accepting the averments as true

49

and affording Plaintiffs the benefit of all reasonable inferences deducible from those averments, as we must at this stage, we cannot conclude that the Complaint shows with the required certainty that Plaintiffs are barred from recovery by application of the "inherent risk/no duty" rule. See, e.g., Onyshko v. National Collegiate Athletic Ass'n, No. 2014-3620 (C.P. Washington Mar. 24, 2017) (denying National Collegiate Athletic Association's (NCAA) motion for summary judgment on plaintiffs' claims that NCAA negligently failed to adequately supervise and minimize the risk of long-term brain injuries resulting from repeated head impacts while playing collegiate football; rejecting NCAA's reliance on Craig as not imposing a duty based on inherent risks in playing football). Indeed, the determination that the plaintiff's claims in Craig were barred by the "inherent risk/no duty" rule was reached at the summary judgment stage rather than on the basis of the complaint alone. As the trial court indicated, this issue may be revisited as the case proceeds.

## C. Public Policy
### 1. Contentions

The PIAA also argues, as a matter of public policy, the duties Plaintiffs allege may not be imposed on the PIAA. It asserts that, in analyzing whether Plaintiffs adequately pled a duty, the trial court applied the Althaus factors. The PIAA contends the Althaus factors heavily implicate public policy considerations.

Importantly, the PIAA argues, "unless the justifications for and consequences of judicial policymaking are reasonably clear with the balance of factors favorably predominating, [a court] will not impose new affirmative duties." Seebold v. Prison Health Servs., Inc., 57 A.3d 1232, 1245 (Pa. 2012). "The

50

[Pennsylvania Supreme] Court has said it is 'reluctan[t] to impose new affirmative duties,' especially where there is an existing and longstanding framework establishing what duties generally apply, and that a request to add a new duty to such an existing framework 'require[s] concrete and substantial justification.'" Newell v. Montana West, Inc., 154 A.3d 819, 832 (Pa. Super. 2017) (quoting Seebold, 57 A.3d at 1246).

Even in the absence of the application of the specific Althaus factors, the PIAA asserts, it is clear that imposing the alleged duties is inappropriate and contrary to public policy here. Considering their allegations as a whole, the PIAA contends, Plaintiffs seek to impose on the PIAA duties not only to provide greater education and warnings regarding concussions, but also to implement and interpret baseline testing, create and implement diagnosis protocols and sideline testing for return to and removal from play decisions, create and implement proper return-to-activity protocols after concussions, and to ensure qualified medical personnel are on site at all relevant times. Thus, the PIAA argues, Plaintiffs seek to require the PIAA to not only set rules and guidelines, but to monitor, enforce and judge those charged with implementation of the rules and guidelines, as well as those already imposed on others by the SYSA. Considered collectively, the PIAA contends, these obligations would force the PIAA to act as a medical governing body, overseeing decisions and qualifications of doctors, trainers, and other medical professionals involving thousands of participants in thousands of sporting events. The PIAA maintains this is not in the public's best interest.

The PIAA argues the SYSA speaks to Pennsylvania's public policy by expressly placing all relevant duties on persons or entities other than the PIAA, including Commonwealth agencies, schools, coaches, game officials, and medical professionals. It asserts this policy decision is fitting when considered in the context of the relationship of the PIAA to the issues involved. Given the number of sports, competitions, and practices involved, the PIAA could never provide firsthand oversight of all events. Thus, it maintains, placing the ultimate responsibility for these issues on the myriad of people directly involved in these activities provides more practical, effective, and immediate protection of student-athletes and properly avoids placing undue burdens the PIAA.

The PIAA further contends courts confirm the power and duty of schools to determine whether a student may initially participate in interscholastic athletics or is permitted to continue to participate after an injury and uphold schools decisions to bar students from participation for medical reasons.[10] The PIAA argues it has no authority to supersede these decisions, and it does not attempt to do so. Indeed, it asserts, these decisions are expressly reserved for schools and trained medical professionals. See R.R. at 144a-199a.

In addition, the PIAA contends, the alleged duties at issue would require a non-medical expert to become directly engaged in issues more

---

[10] See Calandra v. State Coll. Area Sch. Dist., 512 A.2d 809 (Pa. Cmwlth. 1986) (upholding school district decision to bar student from participation without first getting a tetanus shot); Grube v. Bethlehem Area Sch. Dist., 46 Northampton 54 (C.P. Northampton 1982) (upholding school's decision to bar student with one kidney from participating in football); Crawshaw v. Pa. Interscholastic Athletic Ass'n, 11 Crawford 39 (C.P. Crawford 1970) (school directors have absolute right to make, adopt and enforce reasonable rules and regulations governing athletics; upholding school's decision to deny opportunity to participate to student with diabetes).

appropriately and safely handled by medical professionals. It maintains baseline testing, real time assessments, and removal and return to play protocols and decisions are rightly left to medical professionals.

Moreover, the PIAA argues, it has protocols in place that directly address many of the negligence averments and the enforcement obligations of those protocols rest with the principals of the member schools. See R.R. at 144a-199a. For example, the PIAA's Sports Medicine Guidelines set rules for helmet fitting, prohibit the use of the head as a weapon in football, provide information regarding concussions, and mandate that the member school's team physician has final responsibility to determine when a student-athlete is withheld or removed from participation based on an injury. R.R. at 148a-151a, 173a-75a, 178a. Further, the PIAA asserts, its guidelines provide recommended rules for medical coverage for student-athletic events, as set forth by the Governor's Council on Physical Fitness and Sports. See R.R. at 189a. Clearly, the PIAA contends, it is concerned with and takes very seriously the well-being of student-athletes.

Importantly, the PIAA argues, it has not voluntarily undertaken a duty to enforce the mandates at the school-level. Oversight and enforcement of the above-discussed protocols necessarily rests, by statute and under the PIAA Constitution and By-Laws, with member schools. The PIAA contends the relationship is and should be between the student-athlete and their school or medical provider. The PIAA maintains it neither created nor assumed any duty of care in this regard.

53

The PIAA further argues public policy and common sense favor adoption of the precise allocation of responsibility contemplated by the PIAA and the SYSA. The PIAA, an organization comprised primarily of public schools operating with limited funds provided by those schools, reasonably determined it is in the best interest of the schools and the student-athletes to have the ultimate responsibility for application and enforcement of student safety guidelines rest with schools, medical professionals, and other entities directly involved with the participants and events. Moreover, based on the number of parties involved and the circumstances of each particular instance, the issue of enforcement is complex. Factors relating to enforcement would include and necessarily turn on the school, the sport, the particular student, the circumstances of the injury, and the decisions made by the coaching staff, athletic trainers, and the students' physicians. As such, the PIAA contends, direct enforcement or oversight by the PIAA would be impossible.

The PIAA contends public policy favors restraint regarding imposition of the alleged duties on the PIAA; as such, Plaintiffs' negligence claims should be dismissed. The PIAA maintains this conclusion is supported by application of the Althaus factors. To that end, the PIAA argues, although it does have some relationship with the parties (factor 1), its relationship is significantly more remote than that of families, coaches, trainers, doctors, principals, and school administrators, each of whom is more actively involved in the oversight and monitoring sought by Plaintiffs.

54

The PIAA further contends, while there is social utility (factor 2) in protecting student-athletes, greater social utility is achieved by having those more directly involved and qualified ultimately responsible. The PIAA also argues injecting it into these decisions is contrary to the public interest (factors 2 and 5), as well as the Legislature's stated intentions in the SYSA.

In addition, the PIAA asserts, the consequences of imposing these duties on it (factor 4) are potentially devastating. The PIAA maintains it is not and has never been intended to be a substitute for or supervisor of medical professionals and, it could not reasonably take on these duties absent a complete restructuring of its personnel and finances.

Finally, the PIAA argues, given the existence of SYSA, relevant School Code provisions, the PIAA's existing rules and guidelines, and the involvement of medical professionals, trainers, principals, parents, governmental agencies, and others in directly protecting student-athletes, neither the risk imposed nor the foreseeability of the harm incurred by not imposing the alleged duties on the PIAA (factor 3) are significant. The PIAA asserts there are many other means in place to protect athletes (and from which to seek recovery for failures to protect athletes). As such, it asserts, imposing these additional, duplicative and unreasonable burdens on a publicly-funded association is simply not necessary or appropriate.

## 2. Analysis

The primary element in any negligence cause of action is that "the defendant owes a duty of care to the plaintiff." Althaus, 756 A.2d at 1168. Noting that the "legal concept of duty of care is necessarily rooted in often amorphous

public policy considerations, which may include our perception of history, morals, justice and society[,]" the Supreme Court delineated several "discrete" factors that must be weighed in order to determine if such a duty exists: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty on the actor; and, (5) the overall public interest in the proposed solution. Id. at 1169. "Courts are not required to weigh each factor equally and no individual factor is dispositive." Newell, 154 A.3d at 835 (citations omitted).

Here, in considering whether the PIAA owed a duty to Plaintiffs based on the facts alleged in the Complaint, the trial court analyzed the Althaus factors. Ultimately, the trial court overruled the PIAA's preliminary objection to Plaintiffs' allegations that the PIAA breached its duties by failing to: (1) require and enforce proper screening, baseline testing and interpretation prior to a student-athlete's participation in a sport and proper use of baseline testing for both immediate diagnosis of concussions and return-to-play decisions; (2) fully educate athletic departments and trainers regarding concussion diagnosis, protocols, or provide ongoing education to parents and student athletes; (3) provide adequate medical personnel trained in concussion or adequate medical equipment for use by team physicians and athletic trainers for concussion diagnosis; (4) provide consistent and ongoing warning of long-term risks; (5) create, implement and enforce immediate diagnosis protocols through the use of trained medical personnel, immediate access to baseline testing, and comprehensive "sideline" testing for head trauma (direct or indirect) for continuation of practice or play; and, (6) create, implement, and enforce proper return-to-activity protocols after a concussion diagnosis through medically-

56

supported stepwise concussion protocols implemented by medical professionals trained in concussions.

As the trial court recognized, application of the Althaus factors here is fairly problematic in the absence of any record. Nevertheless, we set forth the following analysis based on the facts averred in the Complaint.

As to the first factor, "duty is predicated on the relationship that exists between the parties at the relevant time." R.W. v. Manzek, 888 A.2d 740, 748 (Pa. 2005). Here, a relationship clearly existed between the body that oversees interscholastic sports and the student-athletes such as Plaintiffs who participate in those sports. While this relationship might not be as direct as the relationship between student-athletes and their schools, coaches and medical personnel, a relationship nevertheless exists.

As to the second factor, the PIAA's oversight of interscholastic sports and its actions and conduct in ensuring participant safety in furtherance of its role, constitute actions of social utility.

With regard to the third factor, "[a] duty arises only when one engages in conduct which foreseeably creates an unreasonable risk of harm to others." Id. Here, it is not entirely clear at this stage whether this factor weighs in favor of imposition of a duty on the PIAA. To that end, the nature of the risk is certainly significant; however, the foreseeability of the harm incurred is not entirely clear. Thus, as the trial court indicated, this factor may ultimately weigh against

57

imposition of a duty against the PIAA, but it is not clear at this stage absent any development of a record.

As to the fourth factor, as the trial court acknowledged, the consequences of imposing a duty on the PIAA appear to be significant and may weigh against imposition of a duty on the PIAA. However, the development of a record is necessary to adequately and definitively address this factor.

With regard to the fifth factor, it would appear that the adoption of additional safety measures for youth who participate in interscholastic contact sports is in the public interest. However, at this stage of the proceedings, it is unclear whether imposition of a duty upon the PIAA in that regard is, in fact, in the public interest.

Thus, as the trial court explained (with emphasis added):

Accepting the Complaint's averments of fact as true for the purpose of evaluating [the] PIAA's demurrer, it must be accepted for present purposes that the failure to require and enforce proper screening, baseline testing and interpretation, and proper use of baseline testing (Paragraph 76, subparagraph (a); failure to fully educate athletic departments and trainers regarding concussion diagnosis, and protocols, and to provide ongoing education with parents and athletes (id., subparagraph (b); failure to provide consistent and ongoing warning of long term risks (id., subparagraph (f)); failure to create, implement and enforce diagnosis protocols, immediate access to baseline testing and 'sideline testing' for continuation of practice or play (id., subparagraph (h)); and failure to create, implement and enforce proper return-to-activity protocols after a concussion diagnosis (id., subparagraph (i); failure to require qualified medical

personnel (Paragraph 6.c.); and[,] failure to mandate removal of athletes (Paragraph 6.d), <u>could conceivably have led to increased harm to athletes suffering concussions. Likewise, for the purpose of evaluating [the] PIAA's demurrer, and, therefore, accepting the Complaint's allegations of fact as true that suggest [the] PIAA's past awareness of the existence of the protocols and policies that Plaintiffs allege have been accepted and established, and potential consequences of failure to comply with those standards, the Complaint avers facts sufficient at this demurrer stage to support a claim that the risk of some level of exacerbation of harm as a result of failure to comply with those latter-identified responsibilities might have been foreseeable.</u>

It appears, also, however, that imposing a duty to provide and perform the responsibilities identified in Paragraph[s] 76 (a), (b), (h) and (i), and the remaining portion of subparagraph (f), and in Paragraph 6.c. and d. would adversely affect [the] PIAA's ability to perform its responsibilities in their present form. However, the case is now only at the preliminary objection stage. There is insufficient record evidence from which such findings regarding Paragraph 76(a), (b), (h) and (i), and the second part of subparagraph (f), and regarding Paragraph 6.c. and d., may be made. Consequently, a final evaluation and decision regarding the consequences of imposition of a duty with respect to the responsibilities suggested in the Complaint's Paragraph 76, subparagraphs (a), (b), (h) and (i), and the remaining portion of subparagraph (f), regarding warning of risks; and in Paragraph 6.c. and d. … must await discovery and further proceedings, and, therefore, of necessity, the task of weighing the social utility of [the] PIAA's conduct against the risk and foreseeability of the harm must likewise be postponed.

Finally, the public should be interested in adopting practical measures to enhance the safety of participation in interscholastic contact sports.

At this demurrer stage … accepting the averments of the Complaint as true, with respect to the Complaint's Paragraph 76 (a), (b) (h) and (i), and part of subparagraph

59

(f), and with respect to the Complaint's Paragraph 6.c. and d., it appears that Factors 1 and 5 weigh in favor of finding the existence of a duty, and that Factor 2 weighs in favor of [the] PIAA. Final determination of foreseeability and the weight of Factor 3 will depend upon findings of fact that may be made after development of an evidentiary record, and although it seems likely that Factor 4 will weigh in favor of [the] PIAA, there is insufficient development of a factual record at this point to sustain [the] PIAA's claim that imposition of a duty as Plaintiffs request would impose an impossible or, at least, impractical burden. Therefore, … the demurrer based on the Complaint's alleged failure to plead facts supporting the imposition of a 'duty' will be overruled with respect to the Complaint's Paragraph 76, subparagraphs (a), (b), (h) and (i), and the identified parts of subparagraph (f), and with respect to the Complaint's Paragraph 6.c. and d., with further ruling to await the close of the pleadings and discovery. See, e.g.[,] [Barton] ([a]lthough the Complaint may survive demurrer, issue of 'duty' is to be revisited, if warranted, based on evidence submitted during subsequent phases of the case).

Tr. Ct., Slip Op., at 34-37. No error is apparent in this analysis.

Of further note is Section 323 of the Restatement (Second) of Torts (entitled, "Negligent Performance of Undertaking to Render Services"), which states:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) His failure to exercise such care increases the risk of such harm, or

60

(b) The harm is suffered because of the other's reliance upon the undertaking.

RESTATEMENT (SECOND) OF TORTS §323 (1965). Section 323 has been adopted as the law in Pennsylvania. Hill (citing Feld v. Merriam, 485 A.2d 742 (Pa. 1984); Cooper v. Frankford Health Care Sys., Inc., 960 A.2d 134, 145 (Pa. Super. 2008); Filter v. McCabe, 733 A.2d 1274 (Pa. Super. 1999)). Further, an increased risk of harm can occur through acts of both commission and omission. Hill.

Here, Plaintiffs allege the PIAA "assumed the role as the guardian of player safety," and, as such, it had a duty to exercise reasonable care toward student-athletes under its authority, including the manner in which concussions and traumatic brain injuries are handled. Compl. at ¶72. Plaintiffs further aver the PIAA's pre- and post-concussion actions and inactions increased the risk of harm to Plaintiffs. Thus, Section 323 of the Restatement (Second) of Torts may apply here. Hill (plaintiff adequately alleged negligence claim based on Section 323 of the Restatement (Second) of Torts where plaintiff pled that NCAA had a duty to protect its players from sickle cell trait and, in failing to discharge that duty, increased the risk of harm to plaintiff); Onyshko (denying NCAA's motion for summary judgment on plaintiffs' claims that NCAA negligently failed to adequately supervise and minimize the risk of long-term brain injuries resulting from repeated head impacts suffered while participating in collegiate football based on Section 323 of the (Restatement (Second) of Torts).

In addition, Seebold and Newell, referenced generally by the PIAA, are inapposite. In Seebold, our Supreme Court held that a physician who treated prison inmates had no common law duty to warn third parties (corrections officers), who

61

were outside the physician-patient relationship, that an inmate had a communicable disease. In <u>Newell</u>, the Superior Court held that a business owner did not owe a duty of care to an invitee who was struck and killed while crossing an adjoining public roadway in order to reach his vehicle. The PIAA offers no developed explanation as to how these cases apply here.

Nevertheless, in a footnote, the PIAA references cases which it asserts stand for the proposition that Pennsylvania courts do not interfere with the PIAA's decision-making. It contends this policy should be observed here with regard to the PIAA's decision to have direct supervisors involved in student-athlete safety decisions be ultimately responsible for those decisions. However, none of the cases cited by the PIAA involved tort suits such as the negligence claims alleged by Plaintiffs here. Indeed, the cases referenced by the PIAA involved claims for equitable relief regarding the PIAA's decisions as to whether students were eligible to participate in interscholastic sports after transfers[11] and the PIAA's decision to sanction a member high school after a fight during a high school football game.[12] As such, those cases are inapplicable here.

For all these reasons, we reject the PIAA's assertions that, as a matter of public policy, the duties Plaintiffs allege may not be imposed on the PIAA here.

---

[11] <u>Revesz ex rel. Revesz v. Pa. Interscholastic Athletic Ass'n, Inc.</u>, 798 A.2d 830 (Pa. Cmwlth. 2002); <u>Pa. Interscholastic Athletic Ass'n, Inc. v. Greater Johnstown Sch. Dist.</u>, 463 A.2d 1198 (Pa. Cmwlth. 1983).

[12] <u>Sch. Dist. of City of Harrisburg v. Pa. Interscholastic Athletic Ass'n</u>, 309 A.2d 353 (Pa. 1973).

## D. Proximate Cause
### 1. Contentions

As a final issue, the PIAA argues, Plaintiffs failed to adequately plead proximate cause. To prove causation, "a demonstration that the breach of duty was both the proximate and actual cause of the injury" is required. Eckroth v. Pa. Elec., Inc., 12 A.3d 422, 427 (Pa. Super. 2010) (internal citation omitted). "Proximate causation is defined as a wrongful act which was a substantial factor in bringing about the plaintiff's harm." Id. at 428. The determination of proximate cause is "primarily a problem of law" and must, as a threshold matter, be "determined by the judge and it must be established before the question of actual cause is put to the jury." Id. at 427-28.

The PIAA asserts Plaintiffs failed to and cannot plead facts showing the alleged breaches were a "substantial factor" in causing the harm they allege. Importantly, there is no allegation that any alleged act or failure to act by the PIAA would have prevented the injuries from occurring. Indeed, the PIAA argues, the only injuries alleged are those that normally flow from head trauma, which is clearly an inherent risk of contact sports.

Further, the PIAA contends, Plaintiffs have not averred the PIAA's alleged failure to act in a particular way proximately caused any specific injuries. The PIAA maintains this is understandable in light of the multitude of factors necessarily involved in each case. Each instance will necessarily have different injuries, involve a different sport, a different school, a different athletic trainer, and a different physician for the student. The PIAA argues decisions of coaching staffs,

63

principals, school boards, and others all intervene to cause or potentially cause student-athletes' injuries.

The PIAA further asserts, to the extent Plaintiffs' position is that the PIAA somehow exacerbated their injuries, Plaintiffs failed to plead facts showing the relationship between the PIAA's conduct and the specific injuries. Again, it contends, the only injuries specifically and factually identified are those that normally arise from initial head trauma. The PIAA maintains it cannot be disputed that, but for the initial head trauma alleged, no injury would have occurred. Yet, the PIAA argues, there is no specific allegation of how the PIAA's conduct resulted in additional injuries or what those injuries are, let alone allegations showing the PIAA's conduct was a substantial factor in causing the injuries.

Stated another way, the PIAA asserts, it is impossible to determine from the Complaint what injuries or portions of injuries suffered by Plaintiffs are even alleged to have been proximately caused by PIAA. Instead, all injuries are lumped together, and the PIAA is left to speculate. The PIAA maintains that Plaintiffs cannot know if any injuries were caused by the alleged breaches remaining in the Complaint. Instead, they merely speculate generally, without any supporting factual allegations, that the PIAA is at fault.

Perhaps most importantly, the PIAA argues, the Complaint sets forth numerous allegations showing the PIAA was not a substantial factor in the injuries alleged. For example, Plaintiffs generally focus on how their individual school personnel addressed resulting symptoms. Compl. at ¶¶13-14, 22, 24, 27. Further,

64

although Plaintiffs appear to question decisions to return them to play, each Plaintiff also alleges he or she was returned to play after clearance by a medical professional. See R.R. at 68a-73a.

The PIAA argues the fact that each Plaintiff was promptly treated at a hospital minimizes any alleged impact of the PIAA and calls into question whether any action by the PIAA could have been a substantial factor in causing the harm at issue. If an athlete is cleared to return to play by medical professionals, the PIAA asserts, it is difficult to understand how the PIAA's alleged breaches could have somehow been a substantial factor in injuries resulting after the athletes were cleared to return. To the extent Plaintiffs allege they were improperly returned to play and the PIAA is somehow liable for any adverse consequences based on the decision to return to play, the PIAA maintains, Plaintiffs necessarily seek to require the PIAA to override state law and the decisions of professional healthcare providers. The PIAA argues that from a policy standpoint this is improper. Such a duty cannot and should not be imposed on the PIAA and is further evidence that Plaintiffs lack a causal link between the actions or inactions of the PIAA and the alleged injuries here.

Moreover, the PIAA asserts, the SYSA requires that a player may not return to play after a concussion "until the student is evaluated and cleared to return to participation by an appropriate medical professional." See Section 2(d) of the SYSA. The PIAA contends these requirements are consistent with the CIPPE form, which states that any student who suffers an injury requiring medical attention must complete Section 8 of the form. R.R. at 208a. That Section specifies (in bold): "If

65

the physician completing this Form is clearing the herein named student subsequent to that student sustaining a concussion or traumatic brain injury, that physician must be sufficiently familiar with current concussion management such that the physician can certify that all aspects of evaluation, treatment, and risk of that injury have been thoroughly covered by that physician." Id. Given Plaintiffs' allegations, the SYSA, and the CIPPE form, the PIAA argues, any alleged causal link to the PIAA is without merit.

Finally, the PIAA asserts, the relationship between the injuries and the PIAA is, at best, remote. Indeed, the PIAA maintains, the Complaint specifically states that decisions to remove a player, or not, based on concussion symptoms were made at the local level by a coach or trainer, each named Plaintiff received medical care and treatment, and for each, a medical professional made the decision to clear the athlete for participation. Compl. at ¶¶13-15, 17, 21-22, 23-25, 27-29.

In sum, the PIAA argues, the Complaint's allegations fail to show how conduct by the PIAA could have been the proximate cause of the alleged injuries. Fundamentally, the concussions allegedly experienced by Plaintiffs were the result of their participation in the sports they played, not any action or inaction by the PIAA. If other injuries occurred separate and apart from the concussions, the PIAA asserts, Plaintiffs should be required to identify both the injury and its specific cause.

**2. Analysis**

66

Our Supreme Court "define[s] 'legal' or 'proximate' cause as that point at which legal responsibility should attach to the defendant as a matter of fairness because the plaintiff has demonstrated (in addition to cause-in-fact) that the defendant's act was a 'substantial factor' or a 'substantial cause,' as opposed to an 'insignificant cause' or a 'negligible cause,' in bringing about the plaintiff's harm. Ford v. Jeffries, 379 A.2d 111, 114 (Pa. 1977). "The determination of [legal or proximate cause] simply involves the making of a judgment as to whether the defendant's conduct although a cause in the 'but for' sense is so insignificant that no ordinary mind would think of it as a cause for which a defendant should be held responsible." Reott v. Asia Trend, Inc., 55 A.3d 1088, 1103 (Pa. 2012).[13]

Accepting as true the Complaint's averments, and all reasonable inferences deducible from the averments, the trial court determined Plaintiffs adequately alleged proximate cause regarding the PIAA's alleged failure to: (1) require and enforce proper screening, baseline testing and interpretation prior to a

_____

[13] To determine whether a party's negligence was the proximate or legal cause of an injury, this Court adopted the "substantial factor" test. Taylor v. Jackson, 643 A.2d 771, 775 (Pa. Cmwlth. 1994). As we explained in Taylor, Section 433 of the Restatement (Second) of Torts sets forth a three-part test for determining whether negligent conduct is a substantial factor in producing the injury:

> (a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
>
> (b) whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible;
>
> (c) lapse of time.

Taylor, 643 A.2d at 775 (quoting RESTATEMENT (SECOND) OF TORTS §433 (1965)).

student-athlete's participation in a sport and proper use of baseline testing for both immediate diagnosis of concussion and return-to-play decisions; (2) fully educate athletic departments and trainers regarding concussion diagnosis and protocols; (3) provide consistent and ongoing warning of long-term risks; (4) create, implement and enforce immediate diagnosis protocols through the use of trained medical personnel, immediate access to baseline testing, and comprehensive "sideline" testing for head trauma (direct or indirect) for continuation of practice or play; and, (5) create, implement and enforce proper return-to-activity protocols after a concussion diagnosis through medically-supported stepwise concussion protocols implemented by medical professionals trained in concussions.

Our review of the Complaint supports the trial court's determination that, at this early stage of the proceedings, Plaintiffs aver sufficient facts to show the PIAA's pre- and post-concussion acts or omissions were a substantial factor in bringing about the harm allegedly suffered by Plaintiffs. See Compl. at ¶¶2, 60, 71-73, 75, 77. Therefore, as to the allegations set forth above, no error is apparent in the trial court's rejection of the PIAA's assertion that Plaintiffs failed to adequately allege proximate cause.

Moreover, to the extent the Complaint's averments are lacking with regard to the element of proximate cause, as stated above (and although not directly before us in this appeal), Plaintiffs filed a first amended complaint that appears to bolster their original averments regarding causation. See R.R. at 331a-362a.

**IV. Conclusion**

68

For all the foregoing reasons, we affirm the order of the trial court, and the matter is remanded for further proceedings consistent with this opinion.

_____
ROBERT SIMPSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jonathan Hites, Kaela Zingaro,   :
Samuel Teolis on Behalf of   :
Minor Domenic Teolis, Individually   :
and on behalf of those similarly   :
situated   :   No. 8 C.D. 2017
  :
      v.   :
  :
Pennsylvania Interscholastic   :
Athletic Association, Inc.,   :
             Appellant   :

# **O R D E R**

    **AND NOW**, this 10th  day of October, 2017, the order of the Court of
Common Pleas of Lawrence County is **AFFIRMED**.  Accordingly, the matter is
**REMANDED** for further proceedings in accordance with the attached opinion.


    Jurisdiction is relinquished.


                          _____
                          ROBERT SIMPSON, Judge